## BRADFORD, E. & C. R. Co. *et al.* v. NEW YORK, L. E. & W. R. Co.

*(Supreme Court, General Term, First Department.    May 18, 1888.)*

CONTRACT—CONSIDERATION—PUBLIC POLICY.

A contract between two railroad companies by which defendant agreed to make good any deficiencies in plaintiffs' net earnings so as to meet the interest on its bonded indebtedness, in consideration of which plaintiff should grant a first lien, next to that of the bondholders, on all its property and franchises, and also deposit with defendant a majority of its capital stock on condition that the right to vote upon said stock should remain with representatives of plaintiff as long as the latter's road was operated satisfactorily to defendant, is not *per se* void as against public policy. DANIELS, J., dissenting.

Appeal from special term, New York county; PATTERSON, Justice.

Action by the Bradford, Eldred & Cuba Railroad Company, and Thomas C. Platt as receiver, against the New York, Lake Erie & Western Railroad Company, for sums alleged to be due plaintiffs on a contract. Judgment was rendered for plaintiffs for $103,201.63, and defendant appeals. The case was tried and appealed once before, and is reported in 42 Hun, 496.

*J. A. Buchanan*, and *Charles Steele*, (*Charles Steele*, of counsel,) for appellant.    *MacFarland, Boardman & Platt*, (*W. W. MacFarland*, of counsel,) for respondents.

BARTLETT, J. I think this judgment should be affirmed unless we are prepared to reverse the previous decision of the general term in this case. 42 Hun, 496. The legality of the contract in question was distinctly upheld by the court on an appeal from an order dismissing the complaint, and I am unable to find anything in the facts which have now been proved upon the trial which ought to change the conclusion reached in that respect, if it was correct. As it is not plain to my mind that the previous decision was erroneous, I am in favor of adhering to it, and therefore vote to affirm the judgment.

VAN BRUNT, P. J., concurs in the result.

DANIELS, J., (*dissenting.*) The judgment was entered on the 25th of May, 1887, for the sum of $102,571.70, besides costs. It was for the amounts which had matured and remained unpaid upon bonds secured by mortgages given by the plaintiff upon its railroads. The sums recovered included those which became due on the 1st of July, 1884, and afterwards, to and including the 1st of January, 1887. The recovery was had under an agreement entered into on the 12th of March, 1883, between the plaintiff and the defendant. This agreement was authorized and sanctioned by a meeting of the plaintiff's directors on the 15th of March, 1883, and it was authorized to be made by a vote of the defendant's directors, held on the 8th of the same month, by which the subject was left to the president, with power to conclude negotiations, and take effective measures for obtaining the control of this and other railroads. It is recited in the agreement that the railroad of the plaintiff connected with the road of the defendant at Wellsville, in Allegany county, and also with the railroad of the Bradford, Bordell & Kinzua Railroad at Eldred, with a branch extending from Little Genesee station to Cuba, in the county of Allegany, where it also connected with the defendant's railroad. By means of these roads, one of which, at least, was held under a lease, the plaintiff owned and operated a line of railroad nearly parallel with the defendant's railroad between Wellsville and Cuba, in the county of Allegany. It was further recited in the agreement that the Eldred Company might require assistance from the defendant in the completion of its railroad, and its successful establishment, operation, and maintenance. After these recitals follows the agreement itself, by which the Eldred Company agrees—*First*, that it will at all times deliver to said Erie Company, for transportation, all the freight and passengers that it can lawfully control or influence, destined to points that can be reached by way of the railroad of the Erie Company, or its connections, and will use its influence to promote the interests and the business of the Erie Company, so far as it can, with proper regard for its own interests; *second,* that, for the protection of the Erie Company in rendering assistance to the Eldred Company under this contract, it will cause to be deposited with the Erie Company a majority of the capital stock of the Eldred Company, in such manner as shall be required, upon which, so long as the management of the Eldred Company shall be satisfactory to it, the Erie Company will give, or cause to be given, to such representative of the Eldred Company as shall be designated by it, the right to vote upon the stock so deposited. The Erie Company agrees—*First*, that, so far as it can, with a proper regard for its own interests, it will use its influence, and exercise its control, to promote the interests and the business of the Eldred Company. *Second*, that, upon condition that the corporate control of the Eldred Company shall become and remain vested in the Erie Company, as above provided, the Erie Company will make good any deficiencies in the net earnings of the Eldred Company to meet the interest upon its present bonded indebtedness, from time to time, as the same becomes due and payable, and for any and all advances so made by it, with interest thereon, as well as for any and all advances made to said Eldred Company by the Erie Company for other purposes,

with interest thereon, the Erie Company shall have, and is hereby granted, a first lien upon the railroad franchises and property of the Eldred Company next after its bonded indebtedness aforesaid, and a first charge upon its surplus earnings next after the payment of the accruing interest upon its said bonded indebtedness. This contract shall continue during the corporate existence of the companies parties hereto.

Witness the corporate seals of the parties hereto set, and duly attested the day and year first above written.

THE NEW YORK, LAKE ERIE & WESTERN RAILROAD COMPANY.

[Seal.]                    By H. J. JEWETT, President.

Attest:   A. R. MACDONOUGH, Secretary.

THE BRADFORD, ELDRED & CUBA RAILROAD COMPANY.

[Seal.]                    By R. G. TAYLOR, President.

Attest:   J. E. RANSOM, Secretary.

The resolution assenting to the agreement on the part of the plaintiff was adopted at a meeting of seven of its directors, six of whom were the owners of stock issued by the plaintiff, and they were all officers of the defendant. On the part of the defendant, the authority was given by its board of directors to its president to enter into the agreement; and it was afterwards executed by him in his official capacity, under this authority, and attested by the secretary.

The directors and officers of the corporation, in the management of their affairs, have been, in general terms, subjected by the law to the same disabilities, in their official action, as have been imposed upon trustees; for they are in fact trustees of the interests committed to their charge for the benefit of others. *Jackson* v. *Ludeling*, 21 Wall. 616; *Wardell* v. *Railroad Co.*, 103 U. S. 651; *Butts* v. *Wood*, 37 N. Y. 317; *Dutton* v *Willner*, 52 N. Y. 312; *Fulton* v. *Whitney*, 66 N. Y. 548. This rule has been applied to all persons sustaining relations of trust and confidence to others, and it has disabled them from dealing with the subject of their trust for the promotion of their own benefit. *Ten Eyck* v. *Craig*, 62 N. Y. 406, 420. And it might probably be consistently held, under this rule, that the directors of the plaintiff, who are also officers of the defendant, were, by the latter circumstance, disqualified from officially acting in the making of this agreement with the plaintiff. They did not, it is true, in making the agreement, act otherwise than as the directors of the plaintiff; but there was this circumstance of their being, at the same time, officers of the defendant, to operate upon their minds as an inducement to make the agreement as favorable as possible for themselves and the plaintiff, and to the detriment and injury of the defendant. The settled policy of the law is to disqualify persons, empowered to act for the benefit of others, at the same time to act in the same transaction for the benefit of themselves. But it is not strictly necessary, for the disposition of this appeal, to declare the law to be such as to invalidate this agreement by reason of the circumstance that the directors of the plaintiff were also officers in the employment of the defendant; for the binding effect of the agreement has also been most strenuously resisted on the ground of want of authority in the two railway companies to enter into it. This resistance has been placed upon the alleged inability of the plaintiff to stipulate for the transfer of its control to the defendant, and of the defendant to accept, receive, or exercise such control over the plaintiff. The action was before this court on a preceding appeal, after the complaint had been dismissed on the opening of the counsel; but this point was not specially considered by the court in the decision resulting in the reversal of the judgment, and directing a new trial. It was not then presented, as it now has been, aided by the facts established by the evidence given upon the subsequent trial. And the decision, then made, is not entirely controlling over the disposition which should now be made of the action. The legal rule applicable to all corporations is that they are to be con-

trolled entirely by the charter, or the provisions contained in the laws under which they may be incorporated. They are entitled to exercise no power or authority beyond that which may be given to them in this or some other equally effectual manner. But, to render their acts legal, they must be strictly within the power and authority conferred upon them by law. They are not permitted, in their transactions, to transcend such power or authority in any respect; and, whenever they do so, they transcend the bounds imposed upon them by the laws under which they are brought into existence and are permitted to act; and, as a general proposition, they can derive no benefit or advantage whatever from contracts or acts exceeding the bounds of their legal authority. Both the plaintiff and the defendant exist and derive their corporate authority under the general railroad laws of the state; and by these laws the affairs and business of a railroad corporation are to be managed by its own board of directors. 2 Rev. St. (6th Ed.) 520, § 5. And no authority has been given to one company operating parallel, or nearly parallel, roads, to transfer or subordinate itself to the control of another. Neither can competing companies, as these, to a limited extent at least, appear to have been, merge or consolidate their lines with each other. Id. 558, § 129. Subject to this restriction, one railroad corporation may contract with another for the use of its road, which thereafter may use it in such a manner as may be prescribed in the contract, (Id. 547, § 80;) and this section has been so construed as to permit one company to lease the railroad or track of another; (Abbott v. Railroad Co., 80 N. Y. 27; Woodruff v. Railway Co., 93 N. Y. 609.) But this provision of the statute has been so construed as to limit it to the object mentioned in it. Railroad Co. v. Railway Co., 86 N. Y. 107. It has not been so applied as to permit one company to obtain the line of road of another for a purpose other than its use; and it is only when that use has been legally acquired that it may accept a surrender, or become the owner, of the stock of the other company, and issue its own shares in their place. 2 Rev. St. (6th Ed.) 551, § 98. So strictly has the general principle already mentioned been applied that, in the absence of statutory authority of this description, one railway company has not been permitted by lease to transfer its road, rolling stock, and franchises to another. Thomas v. Railroad Co., 101 U. S. 71; Railroad Co. v. Railroad Co., 118 U. S. 290, 6 Sup. Ct. Rep. 1094, and Arnot v. Railway Co., 5 Hun, 608, affirmed, 67 N. Y. 315, proceeds upon no departure from this principle. The obligation assumed by the defendant in the contract to make good the deficiencies in the earnings of the plaintiff to meet the interest upon its bonded indebtedness mainly, if not wholly, proceeded upon the plaintiff's agreement to transfer its control to the defendant. So much of the agreement seems to have been beyond the limits of the authority conferred by the statutes upon these corporations. Neither by the sections which have already been mentioned, nor by the provisions authorizing the crossing, intersecting, and uniting of railroads, nor by that directing equality of dealing with each of two or more competing lines of road, (2 Rev. St. 6th Ed. 533, subd. 6, § 39; Id. 546, § 78,) has authority been given for subordinating the management and control of the affairs and business of the plaintiff, in this manner, to the defendant. And, if the case should be disposed of under the agreement itself, it would seem to follow that it could not be carried into execution. Milbank v. Railroad Co., 64 How. Pr. 20, 29; Leslie v. Lorillard, 40 Hun, 392. But it appeared, by the proof upon the trial, that a majority of the owners of the plaintiff's stock deposited it with the defendant pursuant to the stipulation for that object contained in the agreement; and, under the agreement and the authority of such deposit, control was given in this manner, as a matter of fact, to the defendant over the plaintiff; and its freight and passengers were diverted, as far as that was practicable to be done, to the defendant, and the defendant used its influence and exercised its control to promote the interests and business

of the plaintiff. This was a complete performance of the unauthorized agreement between these parties; and while that so continued, even though it was unauthorized by law, the defendant was bound to pay the deficiencies in the interest upon the plaintiff's bonded indebtedness, as it had agreed to do by the contract. It could not, in other words, accept the advantages provided for itself by the contract, and at the same time escape from the performance of its own obligations, on the faith of which those advantages were secured. *Woodruff* v. *Railway Co.*, 93 N. Y. 609; *Raft Co.* v. *Roach*, 97 N. Y. 378. And *Arnot* v. *Railway Co.*, 67 N. Y. 315, followed this rule; for, after the defendant had negotiated and received the benefit of the bonds guarantied by it, the court held that it was not at liberty to deny its ability to enter into the guaranty, or to avoid the payment it had agreed in that manner to make. And *Thomas* v. *Railroad Co.*, 101 U. S. 71, proceeds upon no different principle.

But on the 4th of February, 1885, Thomas C. Platt was appointed receiver of the plaintiff, in an action brought to foreclose the mortgage or mortgages given to secure its bonded indebtedness; and, by the order appointing him receiver, he was directed to forthwith take possession of the property aforesaid, and the appurtenances, including railroad, road-bed, iron, lands, rights of way, easements, rolling stock and equipments, leases, franchises, and all other rights and property whatever, wherever the same may be found, and that he continue the operation of the said road, so far as possible, in the ordinary and usual course, having due regard to the public interest and the accommodation of the public, and keeping the said property in as good condition and repair as the business of the road shall warrant. And it was found as a fact that he "thereupon qualified as such receiver, and took possession and control of the property and franchises of the plaintiff company herein, and has ever since continued and now continues to hold, operate, and possess the same." This appointment, followed by the possession and control of the receiver, necessarily divested the defendant of that control which was secured to it by the agreement, and which formed the chief, if not the entire, consideration of its obligation to pay the interest on the bonded indebtedness. It is entirely clear that the defendant lost its power to control the plaintiff when the receiver was appointed with this authority, and he exercised it by taking possession of the property and franchises of the plaintiff, and holding and operating its railway. This proceeded under an authority paramount to that assenting to or incorporated in the agreement; for it was exercised under the mortgage or mortgages preceding the making of the agreement. And it is entirely evident that the receiver could not, as he is stated to have done, and as he was authorized to do, have taken possession of the property and franchises of the plaintiff, and afterwards controlled such property and franchises, and possessed and operated its railroad, and, at the same time, that the defendant should be vested with or have the control of the same property, franchises, and interests. The power of the receiver was the paramount authority, and it superseded that stipulated and agreed upon in the contract. It also appeared, from the evidence of the receiver himself, that, soon after his appointment, he called upon Mr. King, who was then the president of the New York, Lake Erie & Western Railroad Company, and he testified: "I asked him whether his company proposed to carry out those contracts, [referring to this and another contract of similar import,] and was informed by him that they did not. I was requested by Mr. Spencer, receiver of the Tonawanda Valley & Cuba Railroad Company, at the same time, to make the same inquiry for both roads, and I did so, and Mr. King informed me that it was not the intention of his company to carry out those contracts." Here, therefore, was a plain and distinct repudiation of the agreement, following the exercise of this authority over the franchises and property of the plaintiff by the receiver, and, plainly, as a matter of fact, putting an end to the agree-

ment. And that the president of the defendant was authorized to do as long as the agreement was not within the authority of the railroad corporations by which it was made, and it had in this manner been superseded by the action of the receiver. See *Thomas* v. *Railroad Co.*, 101 U. S. 71, where it was held, after the company had entered into an agreement which it was not authorized to make, that, "having entered into the agreement, it was the duty of the company to rescind or abandon it at the earliest moment. This duty was independent of the clause in the contract which gave them the right to do it. Though they delayed its performance for several years, it was, nevertheless, a rightful act when it was done. Can this performance of a legal duty—a duty both to stockholders of the company and to the public—give to plaintiffs a right of action? Can they found such a right on an agreement void for want of corporate authority, and forbidden by the policy of the law?' To hold that they can, is, in our opinion, to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law the stronger is the claim to its enforcement by the courts." Id. 86. The case of *Railroad Co.* v. *Railroad Co.*, 110 U. S. 667, 4 Sup. Ct. Rep. 185, advances no principle in conflict with the correctness of these conclusions. It neither sanctions the agreement itself, nor restricts the ability of one of the parties to it to refuse to proceed with its performance after a determination has been formed to bring it to an end. By paragraph 7 of the decision of the court in this action it was generally found as a fact that both the plaintiff and the receiver had continued to perform all and singular the acts and things specified in the agreement to be performed by the company. But this, undoubtedly, was intended to relate to no more than the exchange of the freight and passenger traffic; for it appeared as a fact that the defendant in no manner had interfered with the control of the plaintiff, or had dictated as to its elections, or the management of its affairs. And that this finding should be construed to extend no further than has just been suggested is evident from the further fact found, that the receiver did take possession and control of the property and franchises of the plaintiff, and has since continued to hold operate and possess the same. While, therefore, the defendant precluded itself, by its acceptance of the agreement, and the majority of the shares of the plaintiff's stock deposited with it by their owners, from denying its liability to pay down to the time of the appointment of the receiver, or certainly the time of the interview between himself and Mr. King, as the agreement was then superseded and repudiated, the defendant remained no longer liable to supply, by payment, the deficiencies in the interest of the plaintiff's bonded indebtedness. The plaintiff, as a matter of fact, had ceased to realize from its earnings any money applicable to this object, and the foreclosure was instituted for the sale of its property, and the application of its proceeds to the payment of the bonded indebtedness.

It has been urged, in support of the judgment, that the defendant could not avail itself of the objection arising out of the appointment and acts of the receiver, because they resulted from its own default in the performance of the stipulation to pay contained in the contract. But it cannot be so held; for while the default did entitle the trustee, under the mortgages, to foreclose, it did not at any time prevent the plaintiff itself from maintaining just such an action as this to recover the money, under the contract, for the payment of the interest on its indebtedness. As long as the defendant continued to hold and enjoy the benefits of the contract, that liability might have been enforced; but when it was deprived of that enjoyment by the appointment and acts of the receiver, and the further performance of the agreement itself was distinctly refused and repudiated, then no legal ground remained upon which the defendant could afterwards be held liable for the payment of the interest on this indebtedness. But a comparatively small portion of the indebtedness accrued before the appointment of the receiver, and the taking of

the possession of the property and franchises by him, and the refusal of the defendant to proceed further with the performance of the agreement. So far as the moneys accrued previous to that time, the judgment in the case is right; but as to the residue of the judgment, including each of the sums accruing after February, 1885, the judgment is erroneous, while as to those preceding amounts it seems to have been correctly recovered.

Objections were taken to the reading of the deposition of the witness Blanchard; but they were unfounded, inasmuch as the stipulation agreed that his deposition should be read on the trial of the action. And this was such a trial. It was, it is true, erroneous to allow so much of his evidence to be read as depended upon the information he had obtained from the officers of the company concerning the exchange of traffic. That was hearsay, and it should not have been received. But the fact itself was otherwise positively proved by the witnesses John J. Carter and John E. Ransom, whose evidence was in no manner contradicted; and it furnished a legal foundation for the finding of the fact by the court, without the least reliance being placed upon this objectionable evidence. There was no error in rejecting the proof offered concerning the financial condition of the defendant in and after November, 1884; for it distinctly appeared that at that time there was no intention whatever to repudiate or reject the contract upon which this action has been brought. The error in the case consists in the allowance of the interest accruing on the bonded indebtedness after the appointment of the receiver, his taking possession of the property and franchises of the company, and the refusal of the defendant further to proceed with the performance of the agreement; and that will exclude, necessarily, from the judgment all the items contained in the decision of the court after February, 1885; and the additional allowance of costs must also, in any event, fail with this residue of the judgment.

The judgment itself should be reversed, and a new trial ordered, with costs to abide the event, unless the plaintiff stipulates, within 20 days, to limit the recovery to the first three items contained in the decision of the court, with interest thereon to the entry of the order, and costs of the action; and, in case such stipulation shall be given, then, as so modified, the judgment should be affirmed, without costs of the appeal to either party.